EASTERLY, Associate Judge, dissenting: The District sued the defendants in this case alleging a theory of standing that this division rejects: relying on Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), the District asserted it had “parens patriae standing based on its quasi-sovereign interest in the economic well-being of D.C.’s gasoline consumers and the gasoline market.” Although the burden to establish standing to sue is on the plaintiff, and injury to a quasi-sovereign interest under Snapp is the only theory of standing that the District ever advanced in the trial court or this court, the majority opinion holds that the trial court “erred” when it granted the defendants’ motion under Superior Court Civil Rule 12(b)(1) to dismiss the District’s complaint for lack of standing. Ante Part III.A. The majority opinion reaches this conclusion because it identifies a new sovereign interest theory of standing for the District— new not merely to this case, but to the law. Under the majority opinion’s new theory, the District has standing to sue whenever there is a D.C. Code provision .the District believes is being violated. Relying on an array of inapposite cases, the majority opinion reasons that the District has a sovereign interest in the enforcement of every D.C. Code provision. Ante note 17. Under this logic, no statutory analysis or particularized inquiry into the- District’s injury is necessary: it is immaterial that the statutory provision at issue in this case only modifies common law contract rules between private parties. (In a footnote, the majority opinion indicates that there may be limits on permitting the District to act on every statutory violation, but whatever those limits are, in the view of the majority opinion, they do not matter in this case. See infra note 22.) Procedurally and substantively, the majority opinion’s analysis is problematic. First, because the plaintiff has the burden to show standing, this court should not articulate for the District government a sovereign interest theory of standing that it has never pursued. Second, in light of our adoption of the Article III standing requirement that parties show concrete and particularized injury, this court should not adopt a sovereign interest theory of standing that so abstracts the Article III interest as to make the jurisdictional requirement of standing ineffectual when the District government, represented by the Attorney General, is the plaintiff, and that allows this court to disregard the prerogative of the legislature to statutorily define government interests. • The majority opinion also concludes that the trial court erred when it granted the defendants’ motion to dismiss under Superior Court Civil Rule 12(b)(6) because the District failed to identify a cause of action, either express or implied, in. Subchapter III of the RSSA. Again, the majority opinion raises an argument that the District has never made and inverts the legal analysis for the government: although we have always required plaintiffs to show they have an express or an implied cause of action to survive a 12 (b)(6) challenge, and although the District has. failed to show that it has either under Subchapter III of the RSSA, the majority opinion concludes that the District — when represented by the Attorney General — presumptively has a right to sue in the public interest unless the statute under which the District seeks to sue expressly denies that authority to the Attorney General. To support this proposition, the majority opinion looks to the 2010 Attorney General for the District of Columbia Clarification and Elected Term Amendment Act, D.C. Act 18-351 (“2010 Attorney General Act”) (codified, as modified, at D.C. Code § 1-301.81 et seq. (2013 Repl.)), and concludes that, when the Council of the District of Columbia (“Council”) “clarified” that the mayorally-appointed Attorney General had an independent obligation to act in the public’s interest — not merely in the interest of the Mayor who had appointed him— it also gave the Attorney General powers that he previously did not possess to sue in the public interest. The majority opinion engages in a statutory analysis that is supported neither by the text nor the historical-record. Thus, even if I agreed that we should look to the 2010 Attorney General Act instead of - Subchapter III of the RSSA to identify the District’s cause of action, I see nothing in that statute indicating that the District, via its Attorney General, has a broad right to sue to enforce any statute (and hence Subchapter III of the RSSA).in the public interest. Because the trial court did not err in dismissing the District’s case either for lack of standing or for failure to identify a cause of action, I respectfully dissent. I. Standing: The 12 (b)(1) Ruling . A. The Plaintiffs Burden To Establish Standing The majority opinion correctly acknowledges that standing is a threshold jurisdictional question, see Grayson v. AT & T Corp., 15 A.3d 219, 229 (D.C. 2011) (en banc), and that, although this court was created by Congress under Article I-of the Constitution, we have adopted the three-part test for standing used in Article’ III courts: injury-in-fact, causation, and re-dressability. UMC Development, LLC v. District of Columbia, 120 A.3d 37, 42-43 (D.C. 2015). But the majority opinion nowhere acknowledges that the plaintiff, whether a private individual or a government entity, bears the burden to establish that these three criteria are satisfied.[1] Id. (“The plaintiff bears the burden to establish standing.” (citing Grayson, 15 A.3d at 246)); accord Spokeo, Inc. v. Robins, — U.S. -, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (“The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing [the three] elements [of standing].”); Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (“The party invoking federal jurisdiction bears the burden of establishing the [Article III] elements [of standing] ... [which] are not mere pleading requirements but rather an indispensable part of the plaintiffs case.”); United States v. San Jacinto Tin Co., 125 U.S. 273, 285, 8 S.Ct. 850, 31 L.Ed. 747 (1888) (“[T]he right of the government ... to institute ... a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief .... ”).[2] A court may raise questions at any time about a plaintiffs standing and the court’s subject matter jurisdiction, Riverside Hosp. v. District of Columbia Dep't of Health, 944 A.2d 1098, 1103 (D.C. 2008), but where, as here,, the defendants successfully , challenged the plaintiffs standing to sue in the trial court, it is not our place to supply the plaintiff with a new legal theory of standing on appeal. Instead, when we agree with the trial court that the legal theory of standing the plaintiff raised is not viable, we must affirm the trial court’s ruling dismissing the plaintiffs suit for lack of standing.[3] The only theory of standing that the District ever advanced in this case is a theory that has, been rightly rejected— first by the trial court and now by the majority opinion, see ante Part III.A.1. The District argued in the trial court and in this court that a significant segment of its population was harmed by defendants’ marketing agreements with gasoline retailers, and the District claimed a quasisover-eign interest to sue on their behalf under Snapp. As the majority explains, see ante pp. 419-20, quasi-sovereign interests are so called because they are the interests a state has in the health and well-being of a substantial segment .of its population under the law of a different sovereign, that of the federal government. Snapp, 458 U.S. at 602, 607, 102 S.Ct. 3260. It. is the cognizable harm to this substantial segment of the population under federal law that allows a state, .as, parens patriae, to evade prudential standing limitations . on raising the rights of third parties in federal court. Id.[4] The state still must satisfy all three Article III requirements; in particular, it. must show a concrete. injury to . its interests under federal law: “more must be alleged than injury to an identifiable group of individual residents,” Snapp, 458. U.S. at 607, 102 S.Ct. 3260, and the state must be more than-a “nominal party,” Id. at 602, 102 S.Ct. 3260 (explaining that “[(Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State’s aiding in their achievement”); see also id., at 608, 102 S.Ct. 3260 (“cautioning] that the State must be more than a nominal party’’).[5] Here, the District sought to claim, under Snapp, that it had standing to sue based on an unquantified injury to an undefined segment of the population due to appellees’ alleged -violation of a provision of the District’s law, Subehapter III of the RSSA, that governs private contractual agreements between distributors and retailers of gasoline. Arguably, the District never satisfied Article III requirements to show that the distributors’ alleged violations of Subchapter III injured the District’s interests in the well-being of its populace as a whole, or even a 'substantial segment thereof.[6] In any event, the majority opinion agrees that Snapp has no application to the District’s asserted right to act as par-ens patriae to pursue a claim under its own law in its own courts. The majority opinion reasons, however, that “[t]he District was not required to assert injury to a quasi-sovereign interest to establish standing to sue.” Ante p. 419.1 agree that the District was free to make any standing argument it desired, but the record is clear that it opted to pursue only one (misguided) standing argument, namely that it had an injury to its quasi-sovereign interests under Snapp. In its complaint, the District asserted that it had authority to “bring[ ] this action as parens patriae on behalf of the residents, general welfare, and economy of D.C.” In its Opposition to the Defendants’ Motions to Dismiss, the District elaborated and made its sole standing argument clear: citing to or quoting from Snapp on almost every page of its eight-page standing analysis, the District argued that, as required by Snapp, it had alleged injury to “a sufficiently substantial. portion of the population,” and, as authorized by Snapp, it was “bringing] this action to protect its quasi-sovereign interest in the well-being of its local economy,” which it linked to the “economic health of ‘the consuming public.’ ” The'District reiterated these arguments at the hearing on the defendants’ motions to dismiss, citing Snapp and asserting that the District was “suing as an injured quasi-sovereign to [redress] injuries to the D.C.’s economy.” After the hearing on the motion, the trial court gave counsel another opportunity to submit “á short, no more than five pages, clarification of arguments or a correction of misstatements by yourself or by the other side.” In its responsive filing, the District reiterated that the foundation .for its standing argument was “the Supreme Court’s holding in the seminal case of Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).” Thus, at the District’s direction,[7] the trial court analyzed the District’s standing under Snapp.[8] Notably, the District has never argued that the trial court had too narrowly construed its standing argument. Instead, on appeal, the District has renewed its argument that it has a quasi-sovereign interest under Snapp. In its Summary of -Argument, it explains that, “[i]n order to sue as parens patriae, the District must allege injury to a quasi-sovereign interest that affects a substantial segment of the District’s residents.” In the body of its brief, it then exclusively argues that under Snapp and its progeny it “has adequately — at minimum plausibly — alleged injury to a quasi-sovereign interest here, and should be allowed to proceed with its complaint.”[9] Although the majority opinion rejects the District’s only standing argument, based on Snapp, it does not hold as it should that the trial court was correct to dismiss the District’s complaint for lack of standing. Instead, the majority opinion supplies a new theory of “sovereign” interests to satisfy the standing requirement for the District. I disagree substantively with this new theory, See infra note 11. But foundationally, I think it is procedurally improper for this court to articulate for the District government a legal theory of standing that it has never pursued. Absent special circumstances (which no one has suggested exist in this case), we would not permit a plaintiff to raise a new legal theory of standing for the first time on appeal. See, e.g., Huron v. Cobert, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (explaining that the rule that “legal theories not asserted at the District Court level ordinarily will not be heard on appeal .... applies to standing, as much as to merits[] arguments, because it is not the province of an appellate court to ‘hypothesize or speculate about the existence of an injury [Plaintiff] did not assert’ to the District Court.”); see also id. at 1280 n.4 (citing cases). I fail to see why this court on appeal may raise a new theory of standing for a plaintiff sua sponte, thereby relieving the plaintiff of its burden to prove its standing to sue, and then grant the plaintiff relief on that basis. B. The Majority Opinion’s Unfounded Theory that the District Has Suffered an Injury to its Sovereign Interest Even if this court may identify a new, “sovereign interest” theory of standing for the District, that theory would still have to satisfy the three “irreducible” requirements of Article III standing. Grayson, 15 A.3d at 234 n.26. But this endeavor fails at the first step; the District has no cognizable interest in the enforcement of Sub-chapter III of the RSSA — a provision that deals with private contractual agreements between distributors and retailers of gasoline — such that it can claim the necessary “concrete and particularized” injury, id. at 246.[10] There are three types of interests that a government may assert have been injured to supply a foundation for Article III standing: sovereign, quasi-sovereign, and proprietary. Snapp, 458 U.S. at 601-02, 102 S.Ct. 3260. The latter two patently have no application here, because the District is seeking neither to vindicate its interest in • the well-being of its citizens under federal law in federal court nor to protect its own property interests.[11] This leaves the District’s sovereign interests. The majority opinion discerns that the District has a sovereign interest in private, contractual agreements between distributors and retailers of gasoline, because these agreements are the subject of a statute, and a government always has a sovereign interest in enforcing its own statutes. I disagree with the majority opinion’s broad declaration that “a government is injured whenever] its laws are violated,” ante p. 424. Instead, to determine whether there is a sovereign interest and thus sovereign injury, we must look to the statute under which the District claims standing to sue — here, Subchapter III of the RSSA. Based on my examination of the text of Subchapter III, the RSSA as a whole, and the legislative history of that Act, see infra Part I.B.2, I see no indication that Sub-chapter III is meant to protect anything other than private, proprietary "interests, 1. Assessing Sovereign Interests Preliminarily, it is important to acknowledge the origins of sovereign power and concede the fact that neither we, as a court, nor the Office of the Attorney General, as an agent of the executive, have the authority to create or define the sovereign interests of a state. This power was derived from'the sovereignty of the king and was passed from the crown to the state legislatures upon’our- nation’s independence,[12] Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. "United States (Mormon Church), 136 U.S. 1, 56-58,10 S.Ct. 792,34 L.Ed. 478 (1890): When this country achieved its independence, the. prerogatives of the crown devolved upon the people of the states. And this power still remains with them, except -so far as they have delegated- a portion of it to the federal government. The sovereign will is made known to us by legislative enactment.[13] Id. at 57. A state legislature wields its sovereign power “to create and'enforce a legal code, both civil and criminal.” Snapp, 458 U.S. at 601, 102 S.Ct. 3260. But in exercising this power, the legislature ⅛ not articulating sovereign interests in every law it passes.[14] Instead, a state legislature may define and protect an array of interests. Looking at the D.C. Code, there are (1) civil statutes that protect the District’s sovereign interests, both (a) statutes codifying common law parens patriae powers, see supra note 13,[15] and (b) statutes expanding those par-ens patriae powers;[16] (2) civil statutes that protect the District’s proprietary' interests;[17] and (3) civil statutes that protect purely private interests.[18] Criminal laws are different; they express only sovereign interests.[19] Thus, we cannot automatically conclude that the mere existence of a statute, no matter the content, signals the existence of a sovereign interest. We must look to the particulars of a civil statute to determine if a sovereign interest is being protected, such that the government can claim standing to sue. See Spokeo, 136 S.Ct. at 1549 (“Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed befpre.” (cleaned up)); Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 773, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (noting that Congress can “define new legal rights, which in turn will confer standing to vindicate an injury caused to the claimant”); Sierra Club v. Morton, 405 U.S. 727, 731-32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (“[T]he inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.”); Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (“The actual or threatened injury required by Art. Ill may exist solely by virtue of ‘statutes creating legal rights, the invasion of which creates standing.’ ”). And we apply established rules of statutory interpretation. See United States v. James, 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986) (“The starting point in statutory interpretation is the language of the statute itself. We assume that the legislative purpose is expressed by the ordinary meaning of the words used.” (cleaned up)); see also District of Columbia v. Beretta, USA., Corp., 872 A.2d 633, 651 (D.C. 2005) (“The text of an enactment is the primary source for determining its drafters’ intent.”).[20] This is where the majority opinion, having sua sponte raised a “sovereign interest” theory of standing on behalf of the District, takes another wrong turn. The majority opinion does not apply tools of statutory interpretation to D.C. Code § 36-303.01(a) — part of Subchapter III of the RSSA — to determine what interests the Council created therein. Indeed, in conducting its standing analysis, the majority opinion ignores the text of D.C. Code § 36-303.01(a), the structure of the RSSA as a whole, and its legislative history.[21] Instead, it rests its standing analysis on the broad, unsupported legal conclusion that the legislature always defines a sovereign interest when it passes a law, i.e., the act of legislating on any subject, in any manner, itself evinces a sovereign interest in the enforcement of that law. The majority opinion presents its theory as a well-established proposition: “Case law establishes that a government is injured when its laws are violated.” Ante p. 424. But this blanket assertion, without limitation or qualification, is not supported by a single appellate decision cited by the majority opinion.[22] Instead, the opinion takes out-of-context statements from cases in which the statutes at issue explicitly define sovereign interests. The majority opinion relies on three criminal cases (two of which are unpublished), see ante note 18, but, as explained above, criminal statutes define only sovereign interests. See supra note 19. Thus these cases cannot be relied upon to support a broader theory of “sovereign” injury that extends to any civil statutory violation. Furthermore, an examination of what these eases actually say reveals that they do not purport to do so. In United States v. Yarbrough, 452 Fed.Appx. 186 (3d Cir. 2011), the Third Circuit stated only that “[t]he Government doubtlessly suffers an ‘injury in fact’ when a defendant violates its criminal laws.” Id. at 189 (emphasis added). Thus its rejection in the next sentence to the defendant’s standing challenge, “because the Government has standing to enforce its own laws,” id., is only reasonably interpreted as a recognition of the government’s “standing to enforce its own [criminal] laws.” Similarly, in United States v. Daniels, 48 Fed.Appx. 409 (3d Cir. 2002), the Third Circuit stated only that, “[a]s sovereign, the United States has standing to prosecute violations of valid criminal statutes.” Id. at 418 (emphasis added). And in this court’s decision in Crockett v. District of Columbia, 95 A.3d 601 (D.C. 2014), we confirmed only that “the Attorney General has an interest, sufficient to confer standing, in the enforcement of the criminal laws of the District of Columbia.” Id. at 605 (emphasis added). The majority opinion also cites an array of civil eases that do not support its theory that the District has a sovereign interest in the enforcement of all District statutes. Many of these cases interpret distinctive qui tarn statutes, which allow private parties to bring suit in the name of the government to vindicate the government’s sovereign-and proprietary interests. First among these is the Supreme Court’s decision in Vermont Agency, which examines a private plaintiffs rights to sue under the False Claims Act, a hybrid criminal/civil statute.[23] The majority opinion incompletely quotes Vermont Agency as stating that “[i]t is beyond doubt that the complaint asserts an injury to the United States[,]” i.e., an “injury to its sovereignty arising from violation of its ,laws[.]” Ante p. 424 (quoting 529 U.S. at 771, 120 S.Ct. 1858). But when the quoted sentence is read in full, it supports only the much more limited (and uncontroversial) proposition that the federal government has a sovereign interest in the enforcement of its criminal laws .and a proprietary interest, in challenging false claims for payment of government funds: ■It is. beyond doubt that the complaint asserts an injury to the United States— both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud. 529 U.S. at 771, 120 S.Ct. 1858 (emphases added). The other qui tam cases cited by the majority, ante note 18, are derivative of Vermont Agency, and their statements about the government’s standing to enforce its own laws reflect only the determination that the statutes at issue in those cases defined a sovereign injury.[24] In addition, the majority opinion cites a few noxi-qwi tam civil cases. Ante notes 18 & 21. Some have, no application to the question in this case.[25] The remainder do not support the majority opinion’s broad conception of a sovereign interest in the enforcement of all statutes; they refute-it. As the-majority itself acknowledges, ante pp. 424-25, the courts in these cases analyze the text of - the particular statute sought to be enforced to discern the sovereign interest.[26] 2. Interests Defined in Subchapter III of the RSSA The District alleged in its complaint that the defendants had entered into contracts for the distribution of .gasoline that violated D.C. Code § 36-303.01(a)(6) & (11), a provision in Subchapter III (governing Marketing Agreements) of the RSSA, which states: All marketing agreements shall be in writing and shall be subject to the non-waiverable conditions set forth in this section, .... [and n]o marketing agreement shall: ... (6) Prohibit a retail dealer from purchasing or accepting delivery - of, on consignment or otherwise, any motor fuels, petroleum products, automotive products, or other products from any person who is not a party to the marketing agreement or prohibit a retail dealer from selling such motor fuels or products, provided that if the marketing agreement permits - the retail dealer to use the distributor’s trademark, the marketing agreement may require such motor - fuels, petroleum products, and automotive products .to be of a reasonably similar quality to those of the distributor, and provided further that the retail dealer shall neither represent such -motor fuels or ■products as having been procured from the distributor nor sell such motor fuels or products under the distributor’s trademark; [or] ... (11) Contain' any term or condition which, directly or indirectly, violates this subchapter. Looking to the text of § 36-303.01, and examining it in the context of the RSSA as a whole and its legislative history, I discern no sovereign interests; I see only private, proprietary interests, which are insufficient to provide the District with standing to sue in- this case. Pennsylvania v. New Jersey, 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (“[A] State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens.”). Section 36-303.01 by its terms imposes limitations on “marketing agreements,” which are defined in pertinent part as “any written agreement; or combination of agreements, including any contract, lease, franchise, or other agreement, which is entered into between a distributor and a retail dealer and pursuant to which” the parties contract for the sale of motor fuel. D.C. Code § 36-301.01 (2013 Repl.) (emphasis added). Distributors and retail dealers are in turn defined as private “persons.” [27] Moreover, if a distributor violates the provisions of § 36-303.01, only retail dealers have a right of action to seek relief under Subchapter III.[28] See D.C. Code § 36-303.04 (2001) (listing the remedies retail dealers may seek against distributors in specific scenarios “in addition to any and all other remedies available”); D.C. Code § 36-303.06 (2001) (specifying the types of civil actions retail dealers may bring against distributors in addition to the remedies available under § 36-303.04 and other statutes or laws). Just as important as what the statute says is what it does not:- nowhere in Subchapter'III'is the District mentioned, either as an interested party or an enforcer, nor is there any indication that regulating the terms of these contracts is in the broader public interest. By contrast, Subchapters II and IV of the RSSA expressly call for the executive branch of the District to promulgate a regulatory scheme governing the operation and conversion of retail service stations, see D.C. Code § 36-302.04(c) (2001) (directing the Mayor to “promulgate all other rules and regulations necessary for the proper implementation and enforcement of subchapters II and IV”), and authorize the District to enforce those statutory provisions and attendant regulations, see D.C. Code § 36-302.05(a) (2013 Repl.) (authorizing the Mayor to order individuals believed to be violating these provisions to cease and desist- and if they dó not comply to seek injunctive relief); § 36-302.05(b) (designating “[a]ny violation of any provision of subchapter II or IV of this chapter or the rules and regulations promulgated pursuant thereto” as “a misdemeanor”). Unlike Subchapter III, Subchapters II and IV clearly define, sovereign interests enforceable by.the sovereign through administrative oversight, affirmative civil litigation, or criminal prosecution. The legislative history of the RSSA likewise reflects that Subchapter III was expressly designed by the Council to regulate private conduct, whereas Sub-chapters II and IV were designed for government enforcement. In the RSSA Committee Report, the Council explained that, in response to its various concerns regarding the distribution and sale of motor fuel in the District,- it had drafted a statute with “three Titles, each involvr ing a different form of regulation,” and each with the purpose of protecting different interests. D.C. Council, Comm, on Transp. & Envtl. Affairs, Report on Bill Nos. 1-333 & 1-39 at 20 (Nov. 16, 1976) (“RSSA Committee Report”) (emphasis added). The section of the Report addressing Subchapter III of the RSSA begins by explaining that its “primary purpose .. .is to afford independent motor-fuel dealers operating under marketing agreements increased legal protection against arbitrary, unreasonable, and discriminatory terminations, cancellations, and non-renewals of their marketing agreements by distributors,” id. at 25, through “preemption]” of traditional contract law, id. at 26. The Report then explains that existing laws “afford inadequate protection to retail dealers” and expresses concern that because of the “significant disparity in bargaining power” between retailers and distributors when executing marketing agreements, “distributors are able, to dictate the terms of a marketing agreement” — a form of contract — “to their own best advantage while taking unfair advantage of the prospective retail dealer.” Id. The Report expressed particular concern about contract terms that permitted distributors to “reserve a unilateral contract right to terminate, cancel[], not renew, or modify a marketing agreement on short notice.” Id. “As a result, retail dealers are generally denied the traditional prerogatives and protections afforded to independent businessmen.” Id. Following this explanation of its impetus, the Report enumerates the five “purposes” Subchapter III will “serve”: (1) to grant increased legal protection to retail dealers ...; (2) to clarify the contractual relationship between distributors and retail dealers ...; (3) to insure that distributors will treat retail dealers in an equitable manner; (4) to end the arbitrary, unreasonable, and discriminatory terminations, cancellations, and nonrenewals of marketing agreements and other abuses of retail dealers and unsavory practices by distributors; and (5) to enhance the independence of retail dealers in the operation of their retail services stations ... and, thereby, enhance fair and honest competition and the ability of retail dealers to tailor their operations to the needs, preferences, and convenience of their local customers. Id. at 28. The Report then explains how the RSSA will “achieve these purposes,” including by prohibiting certain types of contractual provisions and “granting the retail dealer a lega] cause of action for the distributor’s violation” of Subchapter III. Id. at 28-29.[29] By contrast, the. Report states that the “primary purpose” of Subchapters II and IV are, respectively and much inore broadly, “to preserve and, to some extent, enhance competition in the retail marketing segment of the' petroleum industry” through marketplace regulation, id. at 22; see also id. at 22-23 (discussing the four goals that “will be achieved” by Subchap-ter II and referencing increased competition and lower fuel prices), and to protect all “consumers” by “temporarily” limiting closures of full service retail service stations “pending a study of the existing facilities” by the Mayor, id. at 33-34. That the Council intended to protect different interests with different enforcement mechanisms in the subchapters of the RSSA is also reflected in the Report’s discussion of the “fiscal impact” of the legislation. The Council stated that Sub-chapter III of the RSSA “deals exclusively with private rights and, therefore, should have negligible budgetary impacts on the District of Columbia.” RSSA Committee Report at 64. But the Council acknowledged that. Subchapters II and IV would “impose ... additional duties and responsibilities on the District of Columbia Government,” including “enforcement of .violations” of. the provisions in these subchapters. Id. at 63. In sum, the plain text, the structure, and the legislative history of the RSSA demonstrate that the Council clearly and explicitly assigned separate roles for public and private enforcement of the RSSA. .As the RSSA Committee Report explains, Sub-chapter III “deals exclusively with private rights” and interests, not sovereign ones. Id. at 64. Therefore, even if it were permissible for this court to seek out a novel theory of standing not, urged by, the District, I could not agree the District can claim injury to a sovereign interest and thus standing to sue under Subchapter III of the RSSA. II. Cause of Action: The 12 (b)(6) Ruling As. noted above, standing is jurisdictional. If the District lacks standing to sue under the Subchapter III of the RSSA, there is no need to review the trial court’s additional ruling dismissing the District’s complaint for failure to state a claim, i.e., for failure to identify a cause of action in the statute, Super. Ct. Civ. R. 12(b)(6). But the majority opinion, having supplied the District with a theory of standing, reaches the trial court’s 12 (b)(6) ruling and concludes that the trial court erred when it determined that the District possesses neither an express nor an "implied cause of action under Subchapter III of the RSSA. The majority opinion eschews any analysis of an express or implied cause of action under .Subchapter III of the RSSA, instead asserting that the District’s designated ■agent, its Attorney General, derives its right to sue under the 2010 Attorney General Act, specifically, D.C. Code § 1-301.81(a)(1). According. to the majority opinion, § 1-301.81(a)(1) gave the District’s Attorney General a cause of action to sue in the public interest that is unbounded unless the particular statute under which the Attorney General seeks to sue expressly prohibits the Attorney General from suing thereunder. Just as with its standing analysis, the majority opinion confers on the District broad rights that are unfounded in the law, that exempt the government from established rules of litigation, and that raise separation of powers concerns. Once again, I cannot agree with the majority opinion’s analysis. A plaintiff may have a cognizable interest ih a matter such that she has standing to sue, but nonetheless be without a cause of action to pursue her claims in court.[30] To determine if a litigant suing under a statute has an express or implied cause of action, courts look to the statute under which the suit has been filed: Like substantive federal law itself,.private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this'latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Alexander v. Sandoval, 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (cleaned up); accord Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (“The question of the existence of 'a statutory cause of action is, of course, one of statutory construction.”); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 283-84, 286, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). This court conducts the same statutory analysis to determine if the District government has a cause of action. See Beretta, 872 A.2d at 651-52 (holding that the Assault Weapon Manufacturing Strict Liability Act of 1990, D.C. Code § 7-2551.01 et seq. (2001), “confers a right of action on individuals who are injured, but not the District.of Columbia,” looking to the text as “the primary source for determining its drafters’ intent”). The District has conceded in its brief to this court, as it must, that Subchapter III of the -RSSA, unlike other subchapters, “does not provide the District ... with express authority to enforce § 36-303.01(a).” And, by failing to make the argument, it implicitly concedes — again, correctly in my view — that the RSSA does not provide it with an implied cause of action either. There is no indication in the text, structure, or legislative history of the RSSA that the Council intended, to-give the District government a right to sue to enforce, the private, proprietary interests protected by Subchapter III. See supra Part I.B.2. Instead, whereas the. RSSA gives the Mayor enforcement powers under Subchapters II and IV, it does not give the Mayor (or any executive branch official) [31] those powers under Subchapter III of the-RSSA. See supra Part I.B.2. Finally, the Council’s recent, repeated failures to pass bills attempting to give the Attorney General the enforcement power it lacks under Subchapter III indicates. that the Council does not want to give the Attorney General this authority to sue.[32] The Council has, at least for the time being, spoken; the Attorney General’s recourse to obtain authority to sue is to the Council, not this court. See Sandoval, 532 U.S. at 286-87, 121 S.Ct. 1511. Even so, the District argues that it has a right to sue because, “[i]n the absence of any express statutory enforcement mechanism, the District may act- pursuant to its parens patriae authority to seek injunctive relieve- against violations of’ Subchapter III of the RSSA, “so long as it can satisfy the Snapp requirements for parens patri-ae standing.” This inapposite and legally incorrect standing argument is the only argument the District made to this court in support of its authority to sue, and the majority opinion ignores it. Instead, the majority independently concludes that the District has authority to sue under the 2010 Attorney General Act, which defines the “duties” of the Attorney General and provides that this executive officer shall have charge and conduct of all law business of the said District and all suits instituted by and against the" government thereof, and shall-possess all powers afforded the'' Attorney General by the common and statutory law of the District and shall be responsible for upholding the public interest. The Attorney General shall have the power to control litigation and appeals, as well as the power to intervene in legal proceedings on behalf of this public interest. D.C. Code § 1 — 301.81(a)(1). The majority opinion reasons (1) that the 2010 Attorney General Act removed the still-mayorally-appointed Attorney General from under the “direction of the mayor” and gave the Attorney General broad, “common law” powers to sue in the public interest, which he was previously unable to exercise, ante pp. 427-29; (2) that these powers are unfettered unless expressly limited by stat-' ute, see ante pp. 428-29; and (3) therefore, the limits in the RSSA that clearly indicate that the Mayor has no enforcement authority under Subchapter III of the RSSA, see supra Part I.B.2, do not limit the authority of the Attorney General in this suit, see ante Part III.B.2. The majority opinion’s analysis is brand new to this case;[33] it is also ahistorical and atextual. First, we must return to the time of the Adrian Fenty administration, when a number of councilmembers- were displeased with the mayorally-appointed Attorney General, Peter'-Nickles; they felt he was abrogating his duty to act as the District’s lawyer and was'too focused on serving the political interests of the Mayor.[34] The Council developed an interest in making the Attorney General an elected position, independent from the Mayor, but it did not have the authority to unilaterally amend the District Charter to make this change. See Zukerberg v. District of Columbia Bd. of Elections & Ethics, 97 A.3d 1064, 1070 (D.C. 2014). Steps were taken to amend the District Charter, via Congressional action or public referendum, and, in the meantime, the Council passed the 2010 Attorney General for the District of Columbia Clarification and Elected Term Amendment Act. As its full title indicates, the Council sought to “clarify” that the Attorney General was independent of the mayor and legally obligated to act in the public interest and — planning ahead for' the day when the Attorney General was a fully independent, separately elected office — to address how those elections would be conducted. The object of this legislation was not to boost the power of an office the Council thought was too weak, but to redirect in furtherance of the public interest, power that the Council understood the Attorney General already to possess. This is evident in both the text and legislative history of the Act. • ' The first section of the Act, § 101, defines the “duties” of the Attorney General and was modeled on the Corporation Counsel statute, see ante note 24 (quoting the text of the Corporation Counsel statute, D.C. Code § 1-301.111 (2009)). Section 101’(a)(1) omits the introductory language from the Corporation Counsel statute that the Corporation Counsel “shall be at the direction of the Mayor,” and begins with the directive that appears in the second sentence of the Corporation Counsel statute, that the Attorney General “shall have charge and conduct all law business of the said District and all suits instituted by and against the government thereof.” Compare D.C. Code § 1-301.111, with § 1-301.81(a)(1). The Act then adds' that the Attorney General “possess' all powers afforded ... by the common and statutory law of the District” and .has the concomitant “responsib[ility].to upholdf ] the public interest.” The remainder of § 101 reverts to the language of the former Corporation Counsel statute, directing the Attorney General to “furnish opinions in writing to the Mayor,” as well as the Council, “whenever requested to do so”; it also imposes a parallel duty to respond to similar requests from the Council and places .the burden on the Attorney General to. keep a record of these requests and responses. The thrust of this text, as amended, is that the Attorney General is an independent decision-maker whose powers originate not from the Máyor but from common law and statute. But the amended language gives no indication that the Attorney General’s powers are greater than they were under the Corporation Counsel statute. In particular, they give no indication the Attorney General has increased powers to sue to enforce -any and all provisions of the D.C. Code in furtherance-of the public interest, whether or not the statute in question conferred an express or implied cause of action. Nor does any other provision of the Act give the Attorney General, in his “clarified” role as an independent lawyer for the District, such increased authority to sue. See, e.g., 2010 Attorney General Act at § 102 (governing the appointment of the Attorney General by the Mayor, “[u]ntil such time as • an Attorney General is elected”); id. at § 103 (governing the -minimum qualifications and requirements for the Attorney General); id. at § 104 (governing forfeiture the position of Attorney General);[35] id. at § 105 (governing the Attorney General salary). The majority opinion looks beyond the text of the 2010 Attorney General Act to its legislative history to support its argument that the Council gave the Attorney General increased powers to sue in the public interest, ante pp. 428-30, but to no avail. The legislative history underscores that the intent of the 2010 Attorney General Act was to “clarify” that the Attorney General, however selected, was institutionally independent from the Mayor and had a pre-existing obligation to act in the public interest. The Committee Report expressly states that: [T]he Attorney General for the District of Columbia Clarification and Elected ’ Term Amendment Act of 2009, makes clear in the lam what is axiomatic: that the responsibility of the Attorney General is to serve the citizens of the District. The legislation codifies the institutional independence and makes modifications to strengthen .the position of Attorney General through: the establishment of •minimum qualifications and a term of service. D.C. Council, Comm, on Pub. Safety & Judiciary, Report on Bill No. 18-65 at 1-2 (Dec. 16, 2009) (“2009 Committee Report”) (emphases added); id. at .5 (“[T]he District’s Attorney General maintains common law powers, including the position’s duty to the public.” (emphasis added)); id. (explaining that these common law powers were derived from Maryland common law, that they could be abrogated by statute, but that “[a] careful review of the District’s Charter, and relevant statutory provisions pertaining to the Attorney General’s authority, clearly reveal that no such deprivation has been achieved or attempted,” 'but instead that “the responsibilities of the Attorney General have consistently aimed toward the execution of the District’s law business in furtherance of the public interest” (emphasis added)).[36] - The legislative history not only gives 'no indication that any change in the Attorney General’s powers was contemplated — either generallyor with respect to his power to sue — but also expressly states that the only “major substantive change to the Attorney General position under [the Act] is in the selection process.” .2009 Committee Report at 2. The 2009 Committee Report explained that “[w]hile the Attorney General has a long established obligation to represent and defend the legal interests of the public, it is not the public- but the Executive that appoints, the individual to this position.” Id.. (emphasis added). The Act “would remedy this inequity by allowing for the direct election of the Attorney General” and “making clear in the law that he or she is the lawyer for the District of Columbia and is thus to act as the public interest requires;” Id. (first emphasis added). But the report noted that the Act “will not prevent the current Attorney General from continuing to serve in that role.”[37] Id. (emphasis added). The majority opinion, however, seems to think that the reference in § l-301.8Í(a)(l) to “common law” powers to “uphold[ ] the public interest” gives the Attorney General new authority to bring lawsuits in the public interest, even without an express or implied right of action under the statute under which the Attorney General seeks relief. Ante pp. 428-29. Again, there is no indication in the text" or the legislative history of the 2010 Attorney General Act that this was the Council’s intent.[38] But more fundamentally, the majority opinion never specifies what new “common law” powers it thinks were given — or restored — to the Attorney General by operation of the 2010 Attorney General Act. The majority does not identify the substance or scope of these common law powers, or explain why they authorize the Attorney General to sue even without an express or implied cause of action under a particular statute. It is not enough for the majority opinion to cite cases discussing the common law powers of Attorneys General from other states,[39] or to allude generally to “the common law.” There is no uniform, “common law” understanding of a state Attorney General’s powers.[40] If, as the majority opinion suggests, § l-301.81(a)(l) sought to confer enhanced powers on the Attorney General derived from “common law,” we must, per the statute, examine what those powers were under “the common ... law of the District.” As the legislative history of the 2010 Attorney General Act reflects, the District looks to Maryland common-law “in force on February 27, 1801.” D.C. Code § 45-401 (2013 Repl.) (explaining that the District’s common law is derived from Maryland). But the majority does not cite to Maryland case law or treatises from 1801 (or prior) to' establish the scope of the Maryland Attorney General’s powers to sue at that time.[41] Even so, it would be curious to discern that, by operation of the 2010 Attorney General Act, Maryland common law from 1801 gave the District’s Attorney General power to sue in the public interest: even allowing for state-by-state differences, the role of a state Attorney General as it was understood two hundred years ago was to be “the appointed servant of the Sovereign and guardian of the Crown’s interest”; the conception of the Attorney General as defender of the public interest is a construct of the Twentieth Century. National Assoc. of Attorneys General, State Attorneys General 31 (2013). For these reasons, I disagree that the 2010 Attorney General Act fundamentally altered the authority of the District’s Attorney General and gave him broad authority to sue in the public interest to enforcé any statute unless expressly prohibited from doing so. Thus, I think the majority has the analysis backwards when it states that the inquiry is whether the Council has “affirmatively precluded” the Attorney General from suing under, the RSSA, ante pp. 431-32. Instead, as explained above, the trial court was correct to look to Subchapter III of the RSSA to see if the. Council had given the District (represented by the Attorney General) an express or implied right of action thereunder, and was correct to determine that the Council ha,d not.[42] III. Conclusion With its decision in this case, the majority opinion relieves the District government of burdens all other plaintiffs must shoulder if they wish to seek judicial relief-burdens to show standing and a right to sue under a particular statute. As detailed above, I disagree with the particulars of the majority opinion’s legal analysis. But more fundamentally, I question whether the judicial branch should provide such assistance to the executive branch to pursue a lawsuit, particularly when the effect is to countermand the legislature’s decision as to who may enforce the law in question. I respectfully dissent. . The majority opinion instead emphasizes that this court must construe all factual allegations in the complaint in the District’s favor. Ante p. 425. This proposition is unquestionably correct, but it does not pérmit us to raise new legal theories of standing on the District’s behalf. . The majority opinion suggests that, in United States v. Am. Bell Telephone Co. 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888), the Supreme Court "clarified” that different standing rules apply to the government. Ante note 22. But to support this' proposition the majority incompletely quotes that case quoting San Jacinto. Read in full,, the Court (in both cases) was explaining that the government must prove standing to sue just like any private citizen: [Sjince the right of the government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which- are admitted to justify, a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter'..., [I]f there does not appear any obligation on the part of the United.States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances. 128 U.S. at 367, 9 S.Ct. 90 (quoting San Jacinto, 125 U.S. at 286, 8 S.Ct. 850). . Only to the extent that the dismissal is without prejudice, See UMC Development, 120 A.3d at 48 (explaining that a plaintiffs failure to allege standing to sue must result in dismissal without prejudice because the dismissal is not on the merits of the action). Thus an affirmance would not foreclose the plaintiff from returning to the trial court and attempting to prevail on a new legal theory. . See also Oregon v. Legal Servs. Corp., 552 F.3d 965, 971 (9th Cir. 2009) (characterizing a quasi-sovereign interest as more than simply aggregated priváte interests and noting that the state would be precluded,, under prudential standing doctrine, from asserting the legal rights of third parties). . In Snapp, the Court determined that Puerto Rico's quasi-sovereign interests were implicated such that it had standing to sue in federal court where it alleged and substantiated, see id., at 597-98, 102 S.Ct. 3260, "that the petitioners discriminated against Puerto Ri-cans in favor of foreign laborers” in violation of federal law, and that "Puerto Ricans were denied the benefits of access to domestic work opportunities that the Wagner-Peyser Act and the Immigration and Nationality Act of 1952 were designed to secure for United States workers.” Id. at 608, 102 S.Ct. 3260. . The majority opinion, having explained that the District cannot assert injury to a quasi-sovereign interest under Snapp, nonetheless applies the test for quasi-sovereign injury and concludes that the District had'sufficiently alleged injury, as required under Snapp, to a sufficiently substantial segment of its population. See ante note 12. Even under this inap-posite legal theory, the District did not sufficiently plead injury. The District asserted in its complaint only that “many thousands of consumers in D.C.” were being denied unspecified "benefits of competition” as a result of the distribution agreements ■ it wished to challenge, The District never explained in more concrete terms what injury consumers suffered as a result of that denial Moreover, the District conceded at oral argument before this court that the '"many thousands” number was a guesstimate, or as 'they put it, a "quantification ... of the approximate number of people who would be affected" based on the District's assertion in the complaint that ap-pellee CPG owns 27 of the 31 Exxon branded gasoline stations in the District, which it in turn asserted was “aboht 25% of all the gasoline stations in the District.” . The majority opinion appears to fault defendants/appellees for injecting Snapp into this case. Ante pp. 419-20. Arguably, the defendants only challenged the District’s standing under Snapp because the District, in its complaint, appeared to be invoking the parens patriae language of Snapp. In any event, if the District disagreed with the framing of defendants' arguments in their Motions to Dismiss, and never believed itself to have quasi-sovereign standing under Snapp, the District had the obligation — as plaintiff carrying tire burden of proof on this jurisdictional issue — to say so in its opposition and to articulate its theory of standing to sue, in this case. The District did not do this. Instead, it embraced ' Snapp, made it the foundation of its standing analysis, aind explicitly argued in the trial court that its “parens patriae standing [wa]s clear based on Snapp" and its progeny. . The majority opinion also appears to fault the trial court for misconstruing the District’s argument, noting that "the statement in the District’s complaint that it was bringing suit in its parens patriae capacity need not be read as an invocation of the quasi-sovereign inter-es tjparens patriae doctrine discussed in Snapp." Ante note 17; see also infra note 13 (explaining the origins and difference between the two uses of “parens patriae"). But as detailed above, that is precisely what the District asked the trial court to do. See ante p. 422 (conceding that the District “focus[ed] its briefing ... in the trial court, on whether its complaint sufficiently pled a quasi-sovereign interest” under Snapp). . The majority opinion nevertheless asserts that the District's standing argument before this court was not limited to asserting its quasi-sovereign interest under Snapp, alternately stating that "the District has not entirely overlooked” the distinct principles of standing that the majority opinion now determines apply to this case regarding sovereign injury, ante p. 425, and that the District has “undeniably advanced” a sovereign interest theory of injury in this case, ante pp, 424-25. But, to support these differing propositions, the majority opinion quotes from portions of the District’s brief discussing its theory of quasi-sovereign injury under Snapp. Ante pp. 422, 425-26. And the majority opinion ignores the fact that elsewhere in its brief, the District (1) acknowledged “other interests a state can sue to protect,” among them, "sovereign interests,” and then (2) explained it had standing based on a quasi-sovereign interest, which “stand[s] apart” from those "other interests.” The District never argued that any of the "other interests” it had expressly acknowledged gave it standing to sue. The majority opinion also relies on an exchange at oral argument with counsel for defendants/appellees as evidence that the District did not limit its standing argument before this court to asserting an injury to its quasi-sovereign interests under Snapp: “when asked whether the District had in effect asserted a sovereign interest, counsel for the Distributors • did not disagree with that characterization.” Ante note 14. I disagree with this characterization of what was said at oral argument. When counsel for the distribu- ■ tors was asked "whether this is a sovereign interest the District is attempting to enforce,” counsel unequivocally answered "no .... there is no injury to the District of Columbia.” Counsel was then asked, "had [the District] described [its interest] as ... a sovereign interest, would it have been on good footing?” prompting counsel to respond, "I don't think anything would be different," both because the District lacked a cause of action, and because "you can’t just assert a sovereign interest ... [or] mouth the words parens pat-riae." Moreover, if we are looking for implicit concessions at oral argument, we should look no further than the District's response to the very first question from the bench, inquiring why the District "ha[d] not asserted a sovereign interest as opposed to a quasi-sovereign interest” as a basis for its standing to sue. The District did not protest that it had. Instead after stating it had "an interest akin to a sovereign interest” as the majority opinion quotes, it maintained it had a "quasi-sovereign interest,” which it explained "is the terminology that's used in the parens context in order to define a state’s interest which might be different than a state’s sovereign interest.” Although much later, on rebuttal, the District made the single statement quoted by the majority that it had "sovereign authority/’ in the same breath/ it reiterated that its standing argument was grounded in Snapp. This single statement at oral argument does not give this court license to flesh out and endorse on appeal a theory of standing that the District never advanced in-the trial court or in briefing to this court. . The majority opinion does not address the next steps in the Article III standing inquiry— causation (which the District disclaimed a need to prove and which the trial court appears to have found lacking) and redressability. Instead, the majority opinion, having discerned only that the District has a sovereign interest that could be injured, discontinues its standing analysis. . Beyond discrete.property holdings, a state has an interest in the "maintenance and rec-ognitión of [its] borders,” Snapp, 458 U.S. at 601, 102 S.Ct. 3260, which- are sometimes described as "quasisovereign” interests, Hawaii v. Standard Oil Co., 405 U.S. 251, 258-59, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), or "sovereign” interests, Georgia v. Pa. R.R. Co., 324 U.S. 439, 447-49, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). Whatever the proper nomenclature, this interest is obviously not implicated in this case. . The sovereign authority of the Council has a distinct origin — the Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) — and its legislative authority not only has significant substantive limits, see D.C. Code § 1-204.04 (2014 Repl.); D.C. Code §§ 1-206.01, 1-206.02 (2001), but also may be overridden by Congress, which retains plenary legislative authority over the District, see D.C. Code § 1-201.02(a) (2001); § 1-206.01. The majority opinion acknowledges that "the District is merely akin to a sovereign state,” ante p. 421, but assumes that because the District is a "sovereign for many purposes,” -it is sovereign for standing purposes, ante p. 422. If that assumption is correct, it seems wé should not diminish the Council’s sovereign power by allowing the-executive to exercise power the Council has not given it, or by giving the executive that power ourselves. . It is true that the sovereign power to act as parens patriae to protect the most vulnerable members of our society — in the parlance of a different era, "charities, infants, idiots, [and] lunatics,” Mormon Church, 136 U.S. at 58, 10 S.Ct. 792 — also transferred from the King to the states, and that state executives, even without the exercise of legislative authority, have the common law sovereign authority to sue on these persons’ behalf. Id, at 57, 10 S.Ct. 792; see also Snapp, 458 U.S. at 600, 102, S.Ct, 3260 (explaining that this common law sovereign authority to sue to protect persons with legal disabilities "has relatively little to do” with “parens patriae standing,” i.e„ states' ability to raise a quasi-sovereign interest a state has in the well-being of a substantial number-of its citizens under federal law). But.this common law sovereign authority is frozen in time and is no longer subject to expansion by the courts, See Snapp, 458 U.S, at 600, 102 S.Ct. 3260 (noting that "American courts recognized this common-law concept, but now in the form of a legislative prerogative”). Thus, to the extent the majority opinion makes a separate argument that the District in this case also had standing to “bring suit ... as parens patriae to pursue matters arising under local law,” ante note 17, I cannot agree. The majority cites cases that concern the groups protected under the common law sovereign paréns patriae authority — i.e„ charitable trusts and children. Only the legislature may expand the District's parens patriae authority beyond its now static boundaries. The majority opinion cites no case that permits the District to sue "as parens patriae" in a manner other than that authorized at common law or explicitly by statute. . Whether the agents of the state government may defend a statutory provision the legislature has enacted is a separate question from whether the legislature intended for agents of the government to affirmatively enforce it against other parties. “No one doubts that a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional. To. vindicate that interest or any other, a State must be able to designate agents to represent it in federal court.” Hollingsworth v. Perry, 570 U.S. 693, 133 S.Ct. 2652, 2664, 186 L.Ed.2d 768 (2013) (citations omitted)). . See, e.g., D.C. Code § 16-2305 (2013 Repl.) (giving the District the power to file neglect petitions for juveniles); D.C. Code § 21-541 (2013 Repl.) (authorizing the District to file civil commitment petitions). . See, e.g., D.C. Code § 28-4507(b)-(d) (empowering'the District to "bring a civil action in the name of the District ... on behalf of any individual residing in the District ... for injury sustained by such individual to such individual’s property by reason of any violation of” the antitrust laws). . See, e.g., D.C. Code § 28-4507(a) (authorizing the District to "bring a civil action .., for damages” against a private party when the "government is injured in its business or property by a violation of” antitrust laws). . See, e.g., D.C. Code §§ 42-501 to 523 (2001) (regulating estates in land). . It is a foundational premise of our criminal justice system that the violation of a criminal law causes actionable injury to the state itself — not to any complainant. See In re Taylor, 73 A.3d 85, 96 (D.C. 2013) (clarifying that a private party may not prosecute another for a crime because ‘-.'our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed” (cleaned up)). . There is one exception to this rule: we do not conduct a textual analysis of criminal statutes to assess whether they protect a sovereign interest and thus give the government standing to sue, because, as explained above, unlike the civil legal code, criminal statutes define only sovereign interests. See supra note 19. . The majority opinion considers the text of the RSSA in its Rule 12(b)(6) analysis, see ante Part III.B, for a different purpose: to determine if the statute expressly deprives the Attorney General of what the majority understands to be a broad right to sue in the public interest, unless expressly limited by statute. But see infra Part II. . The majority opinion states in a footnote that it is not "say[ing] that the District may sue as parens patriae to enforce every District of Columbia law,”' ante note 15, and cites Shell Oil Co. v. Noel, 608 F.2d 208, 212 (1st Cir. 1979), for the proposition that there is a distinction between statutes “declaring conduct unlawful” and statutes that "determine! ] the right of one person to recover from another.” Thus the majority opinion appears to hold open the possibility that the District might not be permitted to enforce a statute if the statute protects purely private interests. But the majority opinion does not actually disclaim the broad statement that the District has a sovereign interest in the enforcement of every D.C. Code provision. Moreover, other than asserting, without supporting citation, that Subchapter III of the RSSA is a "statutory prohibition[ ] imposed to foster competition for the benefit of consumers,” ante note 15, the majority opinion never explains why this provision, whose plain language only addresses private rights, see infra Part I.B.2, does not fall into the latter category of statutes. In this respect, the majority opinion’s citation to Shell Oil is curious. In that case, a private company sought to sue the executive officers of a state government to enjoin enforcement of a state law regulating the sale of petroleum products. The First Circuit affirmed the district court’s decision to dismiss the case on standing grounds, because the state had never sought to enforce the statute against the company, and it was not clear that the state could do so. The First Circuit concluded it was an unsettled question of state law whether the statute in question created a “mere tort or wrong" for the purchaser against the petroleum company, or whether it "indicate[d] ... a wrong against the general public, which injures the general welfare, and which if done in accordance with the agreement of two or more persons would support” criminal enforcement action by the State. 608 F.2d at 212. Though the majority opinion in this case has framed the issue as whether Subchapter III of the RSSA creates a sovereign interest, the majority opinion declines to conduct the particularized analysis of the statute that the First Circuit in Shell Oil indicated would be necessary to determine the nature-of the interest protected; instead the majority opinion simply declares that “a government is injured when its laws are violated.” Ante p. 423-24. ■ . The text of the False Claims Act clearly indicates that the federal government has proprietary interests at stake, which Congress has authorized a private party to invoke in a civil suit. See 31 U.S.C. § 3729(a)(1) (defining “[ljiability for certain acts” that constitute "false claims” and makes all persons who perform such acts "liable to the United States Government for a civil penalty”); § 3730 (a) (“[T]he Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.”); § 3730 (b) (authorizing a private party to bring the same civil action "in the name of the Government”); see also Vermont Agency, 529 U.S. at 771, 120 S.Ct. 1858 ("[T]he complaint asserts a[ ] ... proprietary injury [to the United States] resulting from the alleged fraud.”). . See Stauffer v. Brooks Bros., 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("Congress has, by enacting [the false marketing provision in the .. Patent Act, another statute containing qui tam provisions], defined an injury in fact to the United States. In other words, a violation of that statute inherently constitutes an injury to the United States. In passing' the statute prohibiting deceptive patent mismarking, Congress determined that such conduct is harmful and should be prohibited. The parties have not cited any case in which the government has been denied standing to enforce its own law," (emphasis added)); Newt LLC v. Nestle USA Inc., No. 09-C-4792, 2011 U.S. Dist. LEXIS 32837, at *4-5 (N.D. Ill. Mar. 28, 2011) ("By enacting [the Patent Act], Congress defined an injury in fact to the United States, The government always has standing to enforce its own laws and, thus, a relator, as the government's .assignee, also has standing to enforce [this provision of the Patent Act].” (citing Stauffer, 619 F.3d at 1325)); Hy Cite Corp. v. Regal Ware, Inc., No, 10-cv-168-wmc, 2011 WL 1206768, 2011 U.S. Dist. LEXIS 55011 (W.D. Wis. Mar. 15, 2011) (The false marketing provision, of the Patent Act "is a qui tam provision .... Because 'Congress has, by enacting [the false marketing provision], defined an injury in fact to the United States," Hy Cite also has standing to assert that injury.” (citing Stauffer, 619 F.3d at 1325)). . The majority opinion quotes a passage from In re Debs, 158 U.S. 564, 584, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) a habeas case in which union officials who had been held in criminal contempt and imprisoned for violating an injunction ordering them to discontinue a railway strike challenged the. government's standing to seek such an injunction. In the passage quoted by the majority opinion, the Court observed only that the government did not have to assert a proprietary -interest in order to establish its standing (although,the Court determined that the government in fact had a “property [interest] in the mails”). Id. at 584, 15 S.Ct. 900, The Court then determined that the federal government 'had standing to seek an injunction based on its constitutionally-based sovereign interests (also reflected in implementing statutes) in regulating interstate commerce. Id. at 586-92, 15 S.Ct. 900. In re Debs does not support the majority opinion’s broad holding that a government has standing to sue whenever any of its laws are violated and is entirely distinguishable, in light of both the nature and origin of the sovereign interest at stake and the "special exigency" of the railway strike at issue in that case. Id. at 592, 15 S.Ct. 900. The majority also cites Castillo v. Cameron Cty., 238 F.3d 339, 351 (5th Cir. 2001), but that case addressed a state’s nonparly standing to appeal an injunction and,,applying the three-part test already established in that jurisdiction to resolve that issue, the Fifth Circuit held that the state could appeal. Castillo provides no support for the majority opinion’s holding that a government has standing to initiate a law suit whenever any state statute has been violated. . See Bhd. of Ry. & S.S. Clerks y. Fla. E. Coast Ry. Co., 384 U.S. 238, 242 n.4, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) (‘‘[W]e have no doubt that the United States had standing to bring this action,” because. the statute “ma[d]e[] it the duty of the United States attorney to institute in the proper court and to prosecute all necessary proceedings for the enforcement of [the section of the Act the company was] charged with violating.” (cleaned up)); EEOC v. Day & Zimmerman NFS, Inc., 265 F.Supp.3d at 192-93, 2017 WL 3613022, at *8, 2017 U.S. Dist. LEXIS 133918 at *20-21 (explaining that "[t]he EEOC has standing to pursue this action” because "[t]hrough the ADA, Congress has charged the EEOC with the function of ‘preventing] any person from engaging in any unlawful employment practice’ that violates the ADA.” (quoting 42 U.S.C. 2000e-5(a))); EEOC v. Celadon Trucking 'Sen’s., No. 1:12— cv-00275-SEB-TAB, 2015 WL 3961180, 2015 U.S. Dist. LEXIS 84639 (S.D. Ind. June 30, 2015) (“[T]he EEOC’^ standing to bring a suit challenging a violation of the ADA ... stems directly from the statute, and the EEOC’s own statutory enforcement authority. We thus agree with the EEOC that the agency suffers an ‘injury’ sufficient to give rise to Article III standing' when a violation of Section 102 of the ADA occurs.” (citations omitted)). . See D.C. Code § 36-301.01(2) (defining a "[djistributor" in pertinent part as “any person who is engaged in the business of selling, supplying, or distributing on consignment or otherwise, motor fuels or petroleum products to or through retail service stations.”); D.C. Code § 36-301.01(13) (defining a “[r]etail dealer" in pertinent part as "any person, other than an employee of a distributor, who owns, leases, operates, or otherwise controls a retail service station for the purpose of engaging in the retail sale of motor fuel”); D.C. Code § 36-301.01(10) (defining a "person” in pertinent part as "any natural person, firm, association, business trust, trust, estate, partnership, corporation, 2 or more persons having a common or joint interest, or other legal or commercial entity”). . The fact that the legislature appears not to have given the government an express or implied cause of action, see infra Part II, also indicates that its objective was only to protect private interests. See Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Although standing in no way depends on the merits of the plaintiff's contention that [the defendant’s conduct violates a statute], it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. Ill may exist solely by virtue of statutes creating legal rights, the invasion of which creates 'standing.” (cleaned up)). . The majority opinion ignores much of this discussion of the rationale for Subchapter III and instead quotes disparate snippets of the Report to support its argument that Subchap-ter III was drafted with the aim of protecting the general public. Ante pp. 434-35. Read in context these select quotations do not support the majority opinion’s argument. And even if these quotations did show that the Council thought that a byproduct of Subchapter III would be some benefit to District consumers generally, that does not establish the government’s sovereign interest and a standing to sue under Subchapter III of the RSSA. In our modem era, the government does not have freeform parens patriae standing to sue to enforce any statute it chooses. See supra note 13. . See Cannon v. Univ. of Chi., 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.”); Jones v. District of Columbia, 996 A.2d 834, 841 (D.C. 2010) (same); see also Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. -, 134 S.Ct. 1377, 1387-88 n.4; 188 L.Ed.2d 392 (2014) (explaining that "the absence of .a valid ... cause of action does not implicate subject-matter jurisdiction, i.e,, the court’s statutory or constitutional power to adjudicate the case” (cleaned up)). . At the time RSSA became law in 1977, see Retail Station Service Dealer Act, D.C. Law 1-123 (1977), the District had a unitary exec- ' utive, the Mayor, who had the power to appoint a "Corporation Counsel.’’ See ante note 24. In 2004, the Mayor changed the title of the Corporation Counsel to "Attorney Gener- ■ al," id., and in 2014 the Attorney General became an elected, rather than appointed, official. . In 2011 — after the 2010 Attorney General Act became law — the Attorney General asked the Council to add language to Subchapter III of the RSSA "providing the Attorney General with express authority to seek injunctions and -civil penalties, on behalf of the public, against distributors that violate the District’s gasoline marketing agreement law.” D.C. Council, Comm. Gov’t Ops. & Env’t, Report on Bill 19-299 at 46 (July 11, 2011) ("2011 RSSA Report”) (letter from the Office of the Attorney General to Councilmember Mary Cheh). The purpose of the bill was, inter alia, to “empower the Attorney General of the District to bring legal actions ... for violations” of the RSSA. Id. at 2. The bill failed in 2012. More recently, in 2014, the Council considered but failed to .act upon a bill to give the Attorney General the power to sue for an injunction under D.C. Code § 36-303.01. See D.C. Council, Retail Service Station and Neighborhood .Services Protection Amendment Act of 2014, § 2 (d) (Sept. 22, 2014). The Council has not taken any action.on this proposed bill since it was introduced nearly three years ago. . The majority quotes from a. trial court pleading to suggest that the District has relied on D.C. Code § 1-301.81 to supply a cause of action all along. Ante pp. 429-30. But the District cited this statute to the trial court only once, in the context of malting the same argument it made before this court — that it automatically had a cause of action by virtue of its standing to sue under Snapp. Even if the District preserved an argument that it had a cause of action under the 2010 Attorney General Act, it waived it in this court. The District’s initial and reply briefs do not contain a single citation to D.C. Code § 1-301.81. Nor do they contain any argument that the 2010 Attorney General Act was the source of the District's authority to sue. . See D.C. Appleseed Center, Memorandum to Councilmember Phil Mendelson at 2 (Sept. 5, 2008) (attached to committee report for the 2010 Attorney General Act. D.C. Council, Comm. on Pub. Safety & Judiciary, Report on Bill No. 18-65 (Dec. 16, 2009) ("2009 Committee Report”)); see also, e.g., D.C. Council, Comm, on Pub. Safety & Judiciary, Report on Proposed Resolution 17-928 at 5 (Nov. 17, 2008) (expressing concern over the lack of independence of the Attorney General and urging the Council to disapprove of Mayor Fenty’s nomination of Mr. Nickles for Attorney General, because Mr. Nickels "assert[ed] that the' Attorney General does not possess any independence from the -Executive Office of the Mayor”). . To the extent the Act sought to "strengthen the position” of the Attorney General, it was through effectuating provisions mandating certain qualifications for the office holder, .setting a term of office, and requiring the appointment of a special counsel when conflicts arose, in order to "provide greater strength and credibility to the position." D.C. Council, Comm, on Pub. Safety & Judiciary, Report on Bill No. 18-65 at 8-9 (Dec. 16, 2009). . If further evidence is needed that the Council did not believe the 2010 Attorney General Act gave new powers to the Attorney General, the- architect of the 2010 Attorney General Act and its chief proponent, Council Chairman Mendelson, see 2009 Committee Report at 11, was the sponsor of the failed attempt in 2014 to give the District authority to sue under. Subchapter III of the RSSA, see supra note 32, It is difficult to reconcile this fact with the majority opinion’s argument the Council may have refused to pass the 2014 amendment because it thought the attorney general had, under the 2010 Attorney General Act, all the power he needed to sue to enforce any statute in the public interest. Ante pp. 433-35. . Furthermore, in a 2011 report, the Council comprehensively listed the "legal responsibilities” of the Attorney General, which in sum and substance mirrored the Council's understanding of the powers attributed to the Attorney General prior to the passage of the 2010 Attorney General Act. Compare D.C, Council, Comm, on Judiciary, Report on Proposed Resolution 19-42 at 5-6 (May 2, 2011), with D.C. Council, Comm, on Judiciary, Report on , Proposed Resolution 17-60 at 1-2 (Apr. 2, 2007). . In support of the proposition that D.C. Code § 1-301.81(a)(1) should be read broadly to give the District’s Attorney General a cause of action in this case, the majority opinion cites the First Circuit's decision in Shell Oil, 608 F.2d 208, discussing the Rhode Island Attorney General’s authority to sue under that state's Motor Fuel Distribution and Sales Act. As noted above, see supra note 22, the First Circuit held that it was unclear under that state’s law whether the Attorney General had the power to enforce a provision that did not give the State an express cause of action. Shell Oil does not support the majority opinion’s argument; it undercuts it. . See ante p. 429 (observing that the Attorney General "typically may exercise all such authority as the public interest requires” (quoting Florida ex rel. Shevin v. Exxon Corp., 526 F.2d 266 268-69 (5th Cir. 1976), which addressed "the right of the Attorney General, under Florida law, to initiate th[e] action” (emphasis added))); see', also ante note 28 (citing cases discussing the-powers of the Attorneys General in Alaska, Kentucky, New Mexico, Massachusetts, and Michigan). .See National Assoc, of Attorneys General, Common Law Powers of State Attorneys General 1 (1977) (“The common law is different in each state, as it depends on definition by that state’s courts ....”); id. at 15 (noting the "astonishing array of mutations [of the powers of a state attorney general] which make it altogether impossible to reach any sweeping generalization on the matter”); Neal Devins . & Saikrishna Bangalore Prakash, Fifty States, Fifty Attorneys General, and Fifty Approaches to the Duty to Defend, 124 Yale L.J. 2100, 2120, 2123 (2015) (”[T]he state office [of attorney general] has rather different contours across the fifty states.... Though there. are some commonalities, the office of the attorney general is not the same across the fifty states....”); National Assoc,. of Attorneys •General, State Attorneys ■ General 31 (2013) ("American -courts have not formulated an accepted delineation of common law powers of the attorney general in this country.”). . The majority cites State v. Burning Tree Club, Inc., 301 Md. 9, 481 A.2d 785 (1984), as one of several cases showing that "case law from numerous other jurisdictions likewise recognizes ‘a broad grant of authority [to the Attorney General,] which includes the power to act to enforce [the state’s] statutes.’ ” Ante note 28. That case addressed the Maryland Attorney General’s standing to challenge the constitutionality of a statute and did not af- . firm the Attorney General’s authority to sue to enforce any state statute ’without an express or implied cause of action. (The court held that the Maryland Attorney General did not have "inherent powers” sufficient to give him standing. Id. at 789.) In any event, the Maryland decision does not reflect the common law from 1801; instead, it.acknowledges that the Attorney General "has only such powers as are vested in him by the Constitution of Maryland and the various enactments” of the Maryland legislature. Id. at 797; see also D.C. Appleseed Center, Memorandum to Council-member Phil Mendelson at 5 (Sept. 5, 2008) (acknowledging that the "common law powers [of the Maryland Attorney General] ... have, since been specifically modified ... through acts of the state’s General Assembly”); see also generally Murphy v. Yates, 276 Md. 475, 348 A.2d 837 (1975); Edward C. Papenfuse, et al., Maryland State Archives, 1 Archives of Maryland, Historical List, Attorneys General (1777-) 1990, http://msa. maiyland.gov/ms a?speccol/sc2600/sc2685/ html/attygen.html. . The majority asserts that it is not an "unwarranted leap” to permit the Attorney General to enforce Subchapter III of the RSSA because this court has already found an implied right of action for other private actors— franchisees — to sue to enforce the marketing-agreement restrictions of § 36-303.01(a). Ante pp. 432-33. But based on a textual analysis of Subchapter III it makes sense to recognize that these private actors may sue. See supra Part I.B.2; see also Davis v. Gulf Oil Corp., 485 A.2d 160, 171 n.12 (D.C. 1984) (expressing ‘‘certain[ty]" that the legislature intended to allow franchisees to sue under this specific provision). The same logic does not pertain to the majority opinion’s reliance on a different statute, D.C. Code § 1-301.81(a)(1), to give the District government the authority to sue to enforce the provisions of Subchapter III of the RSSA.